NO. 13-16920

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHEVRON CORPORATION,

PLAINTIFF-APPELLEE,

v.

STEVEN DONZIGER; THE LAW OFFICES OF STEVEN R. DONZIGER;
DONZIGER & ASSOCIATES, PLLC; JAVIER PIAGUAJE PAYAGUAJED;
HUGO GERARDO CAMACHO,

DEFENDANTS,

v.

JOHN DOE; JOHN RODGERS; LAURA BELANGER,

NON-PARTY MOVANTS-APPELLANTS

On Appeal From The United States District Court
For The Northern District of California
Case No. 3:12-mc-80237-CRB-NC
Honorable Nathanael M. Cousins, U.S. Magistrate Judge

## APPELLANTS' OPENING BRIEF

Cindy Cohn
Nathan Cardozo
ELECTRONIC FRONTIER
FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone:  (415) 436-9333
Facsimile:   (415) 436-9993
cindy@eff.org

Marco Simons
EARTHRIGHTS INTERNATIONAL
1612 K Street, N.W., Suite 401
Washington, DC 20006
Telephone:  (202) 466-5188
marco@earthrights.org

*Counsel for Non-Party Movants-Appellants*

**TABLE OF CONTENTS**

I.     INTRODUCTION.................................................................................. 1

II.    STATEMENT OF ISSUES..............................................................4

III.   JURISDICTIONAL STATEMENT...............................................4

IV.   STATEMENT OF THE CASE .......................................................5

V.    STANDARD OF REVIEW .............................................................6

VI.   STATEMENT OF FACTS ..............................................................6

      A.    THE UNDERLYING *CHEVRON V. DONZIGER* CASE IN THE SOUTHERN DISTRICT OF NEW YORK ................................................ 6

      B.    CHEVRON'S SEPTEMBER 19, 2012 SUBPOENAS TO GOOGLE, YAHOO, AND MICROSOFT .................................................... 8

      C.    WHAT THE IP ADDRESSES SOUGHT BY THE SUBPOENAS REVEAL ABOUT THE ACCOUNT HOLDERS ................................... 9

      D.    THE APPELLANTS................................................................ 11

      E.    THE CHILLING EFFECTS SUFFERED BY APPELLANTS ............................. 12

VII.  SUMMARY OF ARGUMENT ....................................................14

VIII. ARGUMENT.................................................................................16

      A.    THE SUBPOENAS AS LIMITED BY THE MAGISTRATE JUDGE REMAIN OVERLY BROAD AND SHOULD BE QUASHED. ........................................ 16

            1.    The Subpoenas Are Over-Broad and Should be Quashed in Their Entirety................................................................16

            2.    If the Subpoenas Are Not Quashed, they Should Be Further Limited to Exclude Irrelevant Information....................................25

B.   THE SUBPOENAS VIOLATE THE APPELLANTS' FIRST AMENDMENT
     RIGHTS....................................................................................... 26

     1.   The Subpoenas Violate Appellants' First Amendment Right to
          Anonymous Speech. ................................................................27

          a.   The Right to Engage in Anonymous Speech Is Protected
               by the First Amendment. .................................................. 27

          b.   The Right to Anonymous Expression and Association Is
               Not Limited to Instances in Which a Litigant Seeks the
               Content of Communications or to Link a Speaker to a
               Speaker's Statement.......................................................... 29

          c.   The Right to Anonymous Expression Extends to Email
               and Has Not Been Waived Here....................................... 32

          d.   As Chevron's Demands for Identity Information Cannot
               Survive the Scrutiny Required by the First Amendment,
               they Must Be Quashed. .................................................... 34

               i.    Chevron Did Not Issue These Subpoenas in Good
                     Faith or for Any Proper Purpose. ........................... 35

               ii.   Chevron Has Made No Showing that the
                     Information Sought Relates to a Core Claim or that
                     It is Directly and Materially Relevant to that
                     Claim. .................................................................... 36

               iii.  Chevron Has Made No Showing that the
                     Information Sought Is Unavailable from Any
                     Other Source. ......................................................... 37

     2.   The Subpoenas Violate the Appellants' First Amendment Right
          to Association. ..........................................................................38

          a.   Appellants Do Not Need to Be Part of "One Group."...... 41

          b.   Appellants' IP Login Information Reveals Associations . 45

ii

  c. Appellants Have Established a Prima Facie Case that their Expression Has Been Chilled..................................... 46

  d. Disclosure of the Appellants' Information Does Not Serve a Compelling Interest and Is Not the Least Restrictive Means of Furthering a Compelling Interest... 47

   i. Appellants' Right to Anonymous Speech Is Not Waived by the Fact that the Providers Have their Names................................................................... 50

 C. THE SUBPOENAS UNNECESSARILY VIOLATE THE APPELLANTS' PRIVACY INTERESTS UNDER THE CALIFORNIA CONSTITUTION.............. 52

 D. THE APPELLANTS HAVE THIRD-PARTY STANDING TO QUASH THE SUBPOENAS IN THEIR ENTIRETY. ........................................... 55

IX. CONCLUSION .................................................................60

STATEMENT OF RELATED CASES.................................... 62

CERTIFICATE OF COMPLIANCE ...................................... 64

CERTIFICATE OF SERVICE................................................ 65

# TABLE OF AUTHORITIES

## FEDERAL CASES

*ACLU v. Reno*,
  929 F. Supp. 824 (E.D. Pa. 1996)
  *aff'd*, 521 U.S. 844 (1997) ........................................................................... 30

*Acosta v. City of Costa Mesa*,
  718 F.3d 800 (9th Cir. 2013) .......................................................................... 6

*Am. Commc'ns Ass'n v. Douds*,
  339 U.S. 382 (1950) ...................................................................................... 44

*Anderson v. Hale*,
  Case No. 00-C-2021, 2001 WL 503045 (N.D. Ill., May 10, 2001) ....... 44, 45

*Brock v. Local 375, Plumbers International Union of America, AFL-CIO*,
  860 F.2d 346 (9th Cir. 1988) .................................................................. 39, 40

*Buckley v. Am. Constitutional Law Found.*,
  525 U.S. 182 (1999) ...................................................................................... 28

*Buckley v. Valeo*,
  424 U.S. 1 (1976) .................................................................................... 38, 46

*Chevron v. Donziger*,
  Case 1:11-cv-00691-LAK-JCF (S.D.N.Y. Dec. 12, 2012) .......................... 20

*Chevron v. Donziger*,
  Case 1:12-mc-00065 (N.D.N.Y. Jul. 29, 2013) ........................................... 20

*Chevron v. Donziger*,
  Case No. 11-cv-0691 (LAK) (S.D.N.Y. 2011) ............................. 6, 7, 18, 19

*Chevron v. Donziger*,
  No. 13–mc–80038, 2013 WL 1402727 (N.D. Cal. Apr. 5, 2013)............... 41

*Columbia Ins. Co. v. Seescandy.com*,
  185 F.R.D. 573 (N.D. Cal. 1999) ................................................................. 34

iv

*Craig v. Boren*,
    429 U.S. 190 (1976) ................................................................ 56

*Doe v. 2theMart.com, Inc.*,
    140 F. Supp. 2d 1088 (W.D. Wash. 2001) ........................... *passim*

*Doe v. SEC*,
    No. 11-mc-80184 CRB (NJV), 2011 U.S. Dist. LEXIS 132983
    (N.D. Cal. Nov. 17, 2011) ................................................... 28, 51

*Dole v. Service Employees Union, AFL-CIO, Local 280*,
    950 F.2d 1456 (9th Cir. 1991) ............................................ 39, 44

*Enterline v. Pocono Medical Ctr.*,
    751 F. Supp. 2d 782 (M.D. Pa. 2008) ................................. 28, 55

*Gibson v. Florida Legislative Comm.*,
    372 U.S. 539 (1963) ................................................................ 38

*Green v. Baca*,
    226 F.R.D. 624 (C.D. Cal. 2005) ........................................... 25

*In re Anonymous Online Speakers*,
    661 F.3d 1168 (9th Cir. 2011) .............................. 28, 30, 34, 51

*In re Chevron Corp.*,
    No. 1:10-mc-00002-LAK (S.D.N.Y Aug. 16, 2011) ..................... 7

*In re iPhone Application Litig.*,
    844 F.Supp.2d 1040 (N.D. Cal. 2012) ..................................... 52

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) ................................................... 56, 57, 58

*Leonel v. American Airlines, Inc.*,
    400 F.3d 702 (9th Cir. 2005) ............................................ 52, 53

*Lopez v. Candaele*,
    630 F.3d 775 (9th Cir. 2011) .................................................. 55

*Low v. LinkedIn Corp.*,
    900 F. Supp. 2d 1010 (N.D. Cal. 2012) ....................................... 52

*Mattel, Inc. v. Walking Mt. Productions*,
    353 F.3d 792 (9th Cir. 2003) ....................................................... 17

*McIntyre v. Ohio Elections Comm'n*,
    514 U.S. 334 (1995) ........................................................ 27, 30, 32

*McVicker v. King,*
    266 F.R.D. 92 (W.D. Pa. 2010) ................................................... 56

*Meyer v. Grant,*
    486 U.S. 414 (1988) .................................................................... 27

*Mount Hope Church v. Bash Back!*,
    705 F.3d 418 (9th Cir. 2012) ............................................. *passim*

*N.Y. State National Organization for Women v. Terry*,
    886 F.2d 1339 (2d Cir. 1989) ..................................................... 40

*NAACP v. Alabama,*
    357 U.S. 449 (1958) ........................................................ 38, 39, 44

*NAACP v. Button*,
    371 U.S. 415 (1963) ............................................................. 38, 49

*Pallares v. Kohn (In re Chevron Corp.)*,
    650 F.3d 276 (3rd Cir. 2011) ....................................................... 7

*Perry v. Schwarzenegger*,
    264 F.R.D. 576 (N.D. Cal. 2009) ............................................... 42

*Perry v. Schwarzenegger*,
    591 F.3d 1126 (9th Cir. 2009) ........................................... *passim*

*Powers v. Ohio*,
    499 U.S. 400 (1991) .................................................................... 56

*San Francisco County Democratic Cent. Comm. v. Eu*,
826 F.2d 814 (9th Cir. 1987) ..................................................................... 42

*Sec'y of Maryland v. Joseph H. Munson Co.*,
467 U.S. 947 (1984) ................................................................................... 56

*Shelton v. Tucker*,
364 U.S. 479 (1960) ........................................................................ 38, 48, 49

*Thomas v. Collins*,
323 U.S. 516 (1945) ................................................................................... 49

*United States v. Jones*,
132 S. Ct. 945 (2012) ...................................................................... 40, 45, 52

*United States v. Maynard*,
615 F.3d 544 (D.C. Cir. 2010),
*aff'd sub nom. United States v. Jones*, 132 S. Ct. 945 (2012) ..................... 41

*USA Techs., Inc. v. Doe*,
713 F. Supp. 2d 901 (N.D. Cal. 2010) ........................................... 28, 30, 34

*Watchtower Bible & Tract Soc. of NY, Inc. v. Village of Stratton*,
536 U.S. 150 (2002) ................................................................................... 33

*Zweibon v. Mitchell*,
516 F.2d 594 (D.C. Cir. 1975) ................................................................... 39

## STATE CASES

*Dendrite Int'l v. Doe No. 3*,
342 N.J. Super. 134 (N.J. App. Div. 2001) ........................................... 30, 34

*Doe v. Cahill*,
884 A.2d 451 (Del. 2005) ....................................................................... 30, 34

*Hill v. Nat'l Collegiate Athletic Ass'n*,
7 Cal.4th 1 (1994) ................................................................................. 53, 54

*Hooser v. Superior Court*,
    84 Cal. App. 4th 997 (Cal. Ct. App. 2000) ................................................. 53

*Ind. Newspapers Inc. v. Junior Achievement of Cent. Ind., Inc.*,
    963 N.E.2d 534 (Ind. Ct. App. 2012) ...................................................... 56

*Mobilisa, Inc. v. Doe*,
    170 P.3d 712 (Ariz. App. 2007) ................................................................. 28

*Planned Parenthood Golden Gate v. Superior Court*,
    83 Cal. App. 4th 347 (2000) ................................................................ 53, 55

*Tien v. Superior Court*,
    139 Cal. App. 4th 528 (2006) .............................................................. 52, 53

## FEDERAL STATUTES

28 U.S.C. § 1291 ................................................................................................. 4

28 U.S.C. § 1331 ................................................................................................. 4

## FEDERAL RULES

Federal Rule of Civil Procedure 26 ......................................................... 15, 16, 20

Federal Rule of Civil Procedure 45 .................................................................. 5, 16

## STATE RULES

California Rule of Court 8.548 ............................................................................ 53

## FEDERAL CONSTITUTIONAL PROVISIONS

U.S. Const., amend. I ................................................................................. *passim*

## STATE CONSTITUTIONAL PROVISIONS

Cal. Const., art. 1, § 1 ....................................................................................... 52

## I.  INTRODUCTION

This case asks whether and under what standards civil subpoenas to major email service providers can be used to obtain the real identities, associations, and location information about dozens of non-parties to a case, over a seven-year period, based upon their association with Chevron's legal and political opponents – or upon no evidence at all.

The subpoenas here would allow Chevron to discover the movements and associations of these email users as they relate to this litigation but also those far beyond it – potentially reflecting every location from which they checked their email from 2003 until the present. The district court below partially narrowed the subpoenas on overbreadth grounds, but it should have quashed them in their entirety.

Email is a tremendously powerful tool that allows people around the world to communicate privately and easily associate both for political causes as well as intensely personal ones. It also results in email service providers having information that can both identify the user and track their location over time, which reveals their associations. Thus, the strict tests developed by the Supreme Court that apply when civil discovery implicates the First Amendment rights of political organizers to both speak and associate anonymously apply to email communications in full force. Those tests allow production of material that is

1

actually necessary for a party to present his case, but bars discovery, like that at issue here, that is not highly relevant, intimidates critics, or chills association. Moreover, the standard discovery rules of overbreadth apply, rules that are particularly important since email providers have information about all email usage by their customers, not just the email usage specific to the issues in the litigation. Properly applied, these tests should have resulted in the quashing of the subpoenas as to all accounts.

The context here is a long-running campaign to bring public attention and accountability to Chevron for its alleged liability for massive environmental degradation and the associated injuries to human health suffered by residents of the Ecuadorian Amazon. That campaign includes a broad array of activities, including protests and public advocacy. It has also involved litigation in Ecuador that has resulted in a multi-billion dollar judgment against Chevron, and which has spawned a tremendous amount of litigation in the United States, including the underlying case, in which Chevron alleges that the attorneys and others involved in the Ecuadoran litigation engaged in a fraudulent conspiracy to obtain the judgment.

Appellants are not defendants in that action, and indeed, many have had little—and in some cases no—involvement in the Ecuadorian litigation. The merits of the underlying cases in Ecuador and New York are not at issue here, however. This appeal seeks relief only for the Appellants, who are *non-parties* to that

litigation, and others for whom the district court made no findings about their connections to that litigation.

The district court found that neither the First Amendment nor the California constitutional right to privacy were implicated by Chevron's requests and narrowed the subpoenas only partially on overbreadth grounds. The lower court's analysis was based on a flawed understanding of the nature of the information Chevron seeks and of the controlling case law. Moreover, the district court's analysis is dangerous more broadly. Upholding the decision below would threaten not only the rights of the account holders subject to Chevron's harassing subpoena, but also those of every email user of American email service providers.

Should the district court's order be permitted to stand, any litigant could use a third-party subpoena to Internet providers to rob non-parties of their anonymity, locational, and associational privacy based not on some showing that the targets have done anything wrong – or even based on a showing that the specific information sought is necessary for and highly relevant to the litigant's case – but based merely upon evidence that they have associated with *other people* accused of wrongdoing. And if the email users never receive notice of the subpoena or lack the resources to challenge it, the lower court's ruling requires no showing of even tangential relevance before granting the discovery sought.

3

## I.    STATEMENT OF ISSUES

The issues presented by this appeal are:

1.    Whether Chevron's subpoenas to Google and Yahoo are facially overbroad because the relevance of the information they seek has not been demonstrated.

2.    Whether by seeking the identities, movements, and associations of these non-parties over the course of seven years, Chevron's subpoenas to Google and Yahoo violate the non-parties' First Amendment rights to anonymous speech and association.

3.    Whether by seeking the identities, movements, and associations of these non-parties over the course of seven years, Chevron's subpoenas to Google and Yahoo violate the California right to privacy.

4.    Whether Appellants have standing to challenge Chevron's subpoenas on behalf of those who lack the knowledge, resources, or wherewithal to assert their own interests.

## II.    JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case pursuant to 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291.

## III.   STATEMENT OF THE CASE

This appeal arises from two Federal Rule of Civil Procedure 45 subpoenas issued by Chevron Corporation ("Chevron") to Google Inc. ("Google") and Yahoo! Inc. ("Yahoo") in the Northern District of California. Chevron sought documents identifying 70 Google and Yahoo email account holders,[1] as well as the computer usage information associated with the creation of their accounts and every subsequent login to each account, over a nine-year period. In addition to linking the users' identities to the content of their emails, much of which is already in the possession of Chevron, the information sought by Chevron would reveal the movements as well as the personal and political associations of the users of these 70 accounts over those same nine years.

Non-parties owning 32 of the accounts targeted by Chevron moved to quash the subpoenas on behalf of themselves and the other 33 unrepresented accounts, asserting their First Amendment rights to anonymous speech and association, their rights under the California Constitution, and challenging the subpoena's scope.

The district court granted in part and denied in part Appellants' motion to quash, partially narrowing the subpoenas based on their lack of relevance. ER13-

---

[1] Defendants in the underlying lawsuit moved to quash for three accounts they owned. Appellants take no position regarding whether Chevron is entitled to that information and do not appeal the district court's order as it applies to these accounts. Additionally, Chevron withdrew the subpoena as to one account, and another account holder consented to production.

46. Specifically, the district court quashed Chevron's subpoenas as to 26 of the non-party movants on relevance grounds, and narrowed the time frame of the subpoena to approximately seven years for the six Appellants and the unrepresented accounts. *Id*. Of particular note, the district court found that neither the First Amendment nor the California Constitution was implicated by Chevron's subpoenas. ER23-31. The district court made no attempt to assess the relevance of Chevron's requests as they apply to the unrepresented accounts.

Appellants timely appealed. ER11-12.

## IV.    STANDARD OF REVIEW

The Court reviews purely or predominantly legal issues *de novo*. *Acosta v. City of Costa Mesa*, 718 F.3d 800, 810 (9th Cir. 2013) (*de novo* review is appropriate on constitutional questions).

## V.    STATEMENT OF FACTS

### A.    The Underlying *Chevron v. Donziger* Case in the Southern District of New York.

The case underlying this appeal arises from two decades of contentious environmental litigation. In 1993, a group of Ecuadorian citizens sued Texaco, Inc., in the United States for massive pollution and associated injuries to human health Texaco allegedly caused by dumping oil extraction wastes in the Amazon rainforest. Chevron acquired Texaco in 2001, and successfully fought to move the litigation to Ecuador's judicial system in 2003. In support of that litigation,

6

Chevron undertook a course of discovery in the U.S. "unique in the annals of American judicial history." *Pallares v. Kohn (In re Chevron Corp.)*, 650 F.3d 276, 282, n.7 (3rd Cir. 2011). In 2011, an Ecuadorian court handed down a judgment of more than $17 billion against the oil company.

On February 1, 2011, Chevron filed a RICO suit against more than 50 lawyers, organizations, plaintiffs, and other individuals involved in the environmental case in Ecuador, alleging that they obtained the judgment through fraud and other illegal means. *Chevron v. Donziger*, Case No. 11-cv-0691 (LAK) (S.D.N.Y. 2011). That case, before Judge Lewis A. Kaplan, is the source of the subpoenas at issue here.

The court hearing that case has granted Chevron extensive discovery from defendants, chiefly attorney Steven Donziger, including nearly unfettered access to Donziger's computer and email, and even his personal diary. Chevron also has located responsive documents through searches of all of Donziger's electronically stored information using Chevron's search terms. Judge Kaplan also ordered production of all documents under Donziger's control from interns and attorneys with whom he worked in connection with the Ecuadorian litigation and who could have documents responsive to Chevron's search terms. *In re Chevron Corp.*, Order, No. 1:10-mc-00002-LAK (S.D.N.Y Aug. 16, 2011).

On November 12, 2013, the Ecuadorian Supreme Court upheld the judgment against Chevron, but reduced it to $8.8 billion.

### B.    Chevron's September 19, 2012 Subpoenas to Google, Yahoo, and Microsoft.

On September 19, 2012, Chevron served sweeping subpoenas on Google, Yahoo, and Microsoft demanding identity and email usage information associated with 100 email accounts from 2003 to present. The subpoenas to Google and Yahoo were issued by the United States District Court for the Northern District of California, and Appellants' motion to quash is the subject of this appeal.[2]

Google and Yahoo attempted to notify the affected account holders about the subpoenas by email, though it is unclear on the record how many received actual notice in time to challenge the subpoena, or even at all. For example, the owner of the email address hueyzactlan@gmail.com was only able to secure counsel and join the Appellants' motion to quash after it was filed and during the pendency of the motion. ER18. Furthermore, there is evidence on the record to suggest that some of the targeted accounts are no longer active. *Id.*

The subpoenas to Google and Yahoo seek identity information and email usage records associated with 44 and 26 email addresses respectively. They each demand the production of all documents from 2003 to the present related to:

---

[2] The subpoena to Microsoft was issued by the District Court for the Northern District of New York and is on appeal in the Second Circuit, Case No. 13-2784.

(A)    identity of the users of all of the listed email addresses, including but not limited to documents that provide all names, mailing addresses, phone numbers, billing information, date of account creation, account information and all other identifying information associated with the email address under any and all names, aliases, identities or designations related to the email address; [and]

(B)    the usage of all of the listed email addresses, including but not limited to documents that provide IP logs, IP address information at time of registration and subsequent usage, computer usage logs, or other means of recording information concerning the email or Internet usage of the email address[.][3]

ER140, ER148.[4]

## C.    What the IP Addresses Sought by the Subpoenas Reveal about the Account Holders.

An Internet Protocol address ("IP address"), logs of which are sought in part (B) above, is a unique numeric value used to identify every computer, or set of computers, on the Internet. ER120-26. Portable devices such as tablets, smartphones, or laptops are often assigned different IP addresses depending on the location of the device. *Id*.

Most websites, including Google's Gmail and Yahoo's email services, maintain logs of IP addresses associated with every login to the site, including data such as the time and date of the login. *Id*. IP addresses are assigned to Internet

---

[3] The Google subpoena contains an additional request for IP address information associated with one specific email. ER140. This information is also likely covered by category (B).

[4] Note that Google and Yahoo may not have all nine years' worth of information. ER47-50.

Service Providers ("ISPs") in blocks. *Id*. Because of the way they are assigned, an investigator can use an online service to obtain information about the assignee of any IP address. *Id*. In some cases, an IP address can correlate to an exact physical location, although in many instances, it is only possible to associate an IP address with an ISP's regional office. *Id*.

Thus, if Google and Yahoo still have and were to produce the requested information, Chevron would learn the IP address associated with every time a user checked his or her email for every account over a seven-year period. Chevron could identify the countries or cities where the users logged into the accounts, and perhaps, in some instances, could determine the actual building addresses. When collected in bulk, Chevron could use the IP logs to determine when two users are physically together, as their computers will likely have the same IP addresses at the same time. ER125.

Since the IP logs reflect where a person is and often who they are near when they check their email, the logs can reveal personal, social, political, medical and religious associations. They may reflect where someone sleeps, works, and travels, whether for work or personal reasons, if they choose to read their email (or if their device automatically checks it) at that location. Thus Chevron's subpoenas sweep very broadly, encompassing personal and professional activities of the account holders far beyond those related to the issues in the New York case.

10

### D.    The Appellants.

As noted above, none of the Appellants is a defendant in Chevron's underlying case. As the representative declarations referred to below demonstrate, some of the Appellants (the anonymous non-parties are referred to here as "John Doe," or collectively "Does") worked briefly on the litigation in Ecuador as volunteer summer interns several years ago, while others never worked on the litigation at all. All of them have been involved in the broader Ecuador campaign, however, including as journalists, activists, interns, volunteers and young attorneys.

The owner of cortelyou@gmail.com, Doe 1, is an attorney and has used the account for confidential attorney client communications and to communicate with confidential sources for a publication. ER115. Doe 1 has been accused of no wrongdoing and the requested information will provide significant private and wholly irrelevant information to Chevron.

Doe 2, the owner of firger@gmail.com uses the account for private communications, attorney client communications and communicating with sources for publications. ER112. Chevron has made no allegations of any wrongdoing by John Doe 2 and access to his usage information over this period of time would reveal significant amounts of private and irrelevant information to Chevron.

11

Doe 4, owner of kevinkoenigquito@gmail.com, has worked on public campaigns calling on Chevron to clean up the Ecuadorian Amazon but has not worked on the litigation. Furthermore, Doe 4 uses his account primarily for personal communications, and rarely for communications associated with the Chevron advocacy campaigns. ER105. Doe 4 is based in Ecuador and faces many risks in his work. Rather than provide Chevron with relevant information, production would reveal private personal information and expose Doe 4 to increased personal risk in his daily life. ER106.

Similarly, the owner of tegelsimeon@gmail.com, Doe 3, has previously worked on public advocacy on behalf of the communities affected by Chevron's former operations in Ecuador, but never on the litigation. ER109. He is a full time journalist and has used his account to communicate with confidential sources. ER110. Chevron has alleged no wrongdoing by Doe 3, and production of his usage information would provide Chevron with irrelevant, private, personal information about Doe 3's movements. *Id*.

### E.    The Chilling Effects Suffered by Appellants.

The Does have provided unrebutted declarations attesting that they currently feel harassed by Chevron's attempt to obtain the information it seeks, and fear further harassment if Chevron actually gains access to personal information about their email use. ER116; ER113; ER110; ER106; ER100; ER97.

12

Some Does state they know of other individuals who have been subjected to harassment, threats, and intimidation for working in connection with the litigation against Chevron in Ecuador or related activism efforts. ER137; ER134. Two declarants express concern for their physical safety if Chevron gains access to the information it seeks. ER106; ER103.

Even before these subpoenas were issued, Chevron's litigation tactics in the underlying case had already chilled the Appellants' political expression and resulted in membership withdrawal. As two Doe declarants noted, they have refused opportunities to work on the Chevron litigation after seeing what Chevron had put others through who worked on the case and related activism. ER116; ER100.

The Does' declarations also reflect a likelihood of chilled expression in the future. Many of the Does state if they had known their email usage information and location would be revealed to Chevron, their political expression at the time they were assisting with the litigation or participating in related advocacy efforts would have been chilled. ER116; ER113; ER110; ER97. They say their future political and associational activities related to Chevron will be chilled if the company obtains the personal information it seeks. ER116; ER113; ER110; ER106; ER100, ER97. They believe their associational activities will be chilled more generally as well. ER116; ER113; ER110; ER106; ER100; ER97.

## VI.    SUMMARY OF ARGUMENT

Chevron's subpoenas here are overbroad even under the lenient standards applicable to normal civil discovery. While the district court narrowed the scope of the subpoenas, most if not all of the information it seeks—including information regarding logins in which no argument has been made about why the target's location matters—is entirely irrelevant to the underlying lawsuit and is not likely to lead to the discovery of admissible evidence. Thus, the subpoenas should be quashed as to all of these accounts regardless of whether the First Amendment applies, and if the Court so finds, it need not reach the federal or state constitutional issues.

However, the First Amendment does apply here, since Chevron seeks discovery based upon the political associations of these non-parties with the Ecuador campaign; specifically Chevron seeks the identities and information it will use to track their locations over a period of seven years. When discovery requests threaten to encroach upon freedoms protected by the First Amendment and California Constitution, more stringent tests must be met.

First, since the subpoenas seek to identify previously anonymous speakers, the *2theMart.com* test should be applied. *Doe v. 2theMart.com, Inc*., 140 F. Supp. 2d 1088 (W.D. Wash. 2001). Chevron cannot meet that test here. Chevron cannot show that these subpoenas were issued in good faith, the information sought relates

14

to a core claim or defense, the identities sought are directly and materially relevant to that core claim, and the information sought is unavailable from any other source.

Second, since the subpoenas seek to track the associations of non-parties, and this tracking has created a chilling effect, the party must show that the "information sought is *highly relevant* to the claims or defenses in the litigation—a more demanding standard of relevance than that under Federal Rule of Civil Procedure 26(b)(1)." *Perry v. Schwarzenegger*, 591 F.3d 1126, 1141 (9th Cir. 2009) (emphasis added). Furthermore, the discovery must be "carefully tailored to avoid unnecessary interference with protected activities, and the information must be otherwise unavailable." *Id*. This standard is not met either.

Third, Chevron's subpoenas violate the California Constitution's guarantee of privacy. No California court has ever approved a subpoena seeking such a vast amount of personal information over such a long period of time, and certainly not related to non-parties. While it is a question of first impression, Chevron has not shown that the discovery it seeks will not seriously intrude on Appellants' privacy.

Finally, Appellants have standing to challenge Chevron's subpoenas as to all account holders. Because Appellants have personally suffered injury in fact, they have a close relationship with the unrepresented accounts, and there is a hindrance in the way of the unrepresented account holders, Appellants should be allowed to stand in their shoes to challenge Chevron's unconstitutional subpoenas.

15

## VII.   ARGUMENT

### A.   The Subpoenas as Limited by the Magistrate Judge Remain Overly Broad and Should Be Quashed.

First, even without the heightened standards applicable under the First Amendment, the information sought in discovery must be relevant to a party's claim or defense. Fed. R. Civ. P. 26(b)(1); Fed. R. Civ. P. 45 Advisory Comm.'s Note (1970). While the district court narrowed the reach of the subpoenas, it should have quashed them in their entirety.

#### 1.   The Subpoenas Are Over-Broad and Should Be Quashed in Their Entirety.

The Court should quash these subpoenas under Federal Rule of Civil Procedure 26(c) because, even as limited by the district court, they are grossly overbroad.

First, by demanding years of detailed email usage information that would catalog the account holders' daily movements, the subpoenas seek a tremendous amount of information that is wholly irrelevant. Chevron's demand is not limited to the IP data regarding specific communications, or specific dates, or communications with the defendants, or even specific non-defendants. Instead, it seeks information about each login from every location, regardless of the purpose of that login.

16

Chevron, of course, was obligated to frame its subpoenas to exclude such irrelevancies. *See Mattel, Inc. v. Walking Mt. Productions*, 353 F.3d 792, 813 (9th Cir. 2003) (upholding the quashing of a subpoena that was "too broad for the explanation given"). And Chevron surely had the ability to do so, particularly given its extensive access to defendants' email accounts. As the lower court noted, Chevron stated it had identified the accounts at issue here by reviewing documents recovered from Donziger's hard drive. ER31. Indeed, Chevron's subpoena to Google asked for the IP address associated with the sending of one particular email. ER140. But Chevron otherwise made no effort to tailor its demands to particular communications or dates. Because Chevron has not attempted to tailor its subpoenas "to the immediate needs of the case," the subpoenas should be quashed. *See Mattel*, 353 F.3d at 813.

Second, Chevron has not shown that any of the information it seeks is relevant; it need not prove anything about the actions, communications, associations, or locations of the non-parties in order to prevail in its underlying lawsuit, and it has not demonstrated that the targets were involved in the acts at issue. Both this Court and the Magistrate Judge correctly noted the central importance of Judge Kaplan's March 15, 2013 Order. Order Granting Stay, ECF No. 10 (October 25, 2013); ER14-15. There, Judge Kaplan limited Chevron's discovery from law firm Patton Boggs ("PB"), to five specific factual issues

17

regarding Chevron's allegation that the Ecuadorian *judgment was fraudulent*. *Chevron Corp. v. Donziger*, 2013 WL 1087236, at \*30 (limiting discovery to the alleged bribery of the Ecuadorean judge and authorship of the judgment; the submission of certain reports to the court under Charles Calmbacher's signature; the termination of the judicial inspection; the appointment of expert Richard Cabrera and the preparation and submission of his report; and the submission in U.S. courts of allegedly deceptive accounts of the Ecuadorian plaintiffs' relationship with Cabrera).

This Court has already noted "the record does not establish the involvement of [five Appellants'] addresses in any of the five areas as to which the trial court in New York found that Chevron had established probable cause to believe there was fraud or other criminal activity." Order Granting Stay, ECF No. 10 (October 25, 2013) at 2.[5] This Court's preliminary finding was correct.

With respect to firger@gmail.com and cortelyou@gmail.com, the Magistrate Judge relied on requests from Donziger to the email address's owners "to research Chevron's spending, investments, and 'to see where they are most politically vulnerable to pressure in other countries.'" ER34. That has nothing to do with any of the five alleged instances of fraud.

---

[5]  Those addresses are: cortelyou@gmail.com, firger@gmail.com, tegelsimeon@gmail.com, kevinkoeningquito@gmail.com, and eriktmoe66@yahoo.com.

With respect to the email addresses tegelsimeon@gmail.com and kevinkoeningquito@gmail.com, the Magistrate Judge noted each owner's declaration that he had never been directly involved in the litigation. ER35-37. That should have been the end of the matter.

Instead, the Magistrate Judge concluded that each worked for an advocacy organization, Amazon Watch, and relied on the fact that each was involved in, and communicated with Donziger about, advocacy campaigns on behalf of the communities suffering from the environmental harms of Chevron's operations. *Id*. But Judge Cousins also cited his own previous decision quashing Chevron's subpoena of Amazon Watch, which found that Amazon Watch was exercising First Amendment rights and "that Chevron failed to show that Amazon Watch's campaigns were unlawful and not[ed] that Judge Kaplan's findings regarding the probability of defendants' fraud did not include any involvement by Amazon Watch." ER40 (citing *Chevron Corp. v. Donziger*, 2013 WL 1402727, at \*4). Indeed, although Chevron submitted multiple briefs and dozens of exhibits in arguing in the context of that subpoena that Amazon Watch was involved in fraud, Judge Cousins held that "all evidence before this Court suggests otherwise." *Id.*

Here likewise, Chevron has not demonstrated any involvement by either of these individuals in any of the five areas identified by the trial court.[6]

The owner of eriktmoe66@yahoo.com has never been involved in the Ecuadorian litigation. ER99. His only connection to the case, aside from his longtime friendship with Donziger, is that he briefly considered getting involved in the litigation to assist Donziger in securing funding. ER37; ER99. That does not fall within the five areas identified by Judge Kaplan.

Given Judge Kaplan's refusal to order discovery about the topics Judge Cousins nevertheless found relevant, these subpoenas should be quashed.

Thus, with respect to these five movants, the district court did not identify any basis for associating their email accounts with any of the relevant topics identified by Judge Kaplan. Similarly, with respect to the unrepresented accounts, the district court failed to conduct *any* analysis of whether Chevron has adequately demonstrated that the addresses or their owners have any connection to the five relevant subjects. (The only address for which the district court found a connection

---

[6] Judge Kaplan's rulings are inconsistent in this regard. At one point, Judge Kaplan found that Chevron's request for information related to the email address simeontegel@hotmail.com was relevant under Rule 26. *Chevron v. Donziger*, Case 1:12-mc-00065, Order at 3 (N.D.N.Y. Jul. 29, 2013) (ECF No. 57). But Judge Kaplan also denied discovery seeking "communications relating to AMAZON WATCH" and discovery into the advocacy campaign since it did not relate to the five alleged instances of fraud. *Chevron v. Donziger*, Case 1:11-cv-00691-LAK-JCF, Order at 65 (S.D.N.Y. Dec. 12, 2012) (ECF No. 658-23). Given Judge Kaplan's conclusion that the communications themselves need not be disclosed, it is difficult to see how the identity and IP log information is relevant.

to any of the relevant subjects is richard.clapp@gmail.com, but as detailed below, Chevron failed to demonstrate any relevance to the discovery sought regarding this account.)

Third, even if Chevron only sought IP information about the targets' communications with defendants (it does not), disclosure would not be justified by the district court's findings regarding relevance or by Chevron's own explanation for why it seeks the information.

The district court made no specific findings regarding how IP logs are relevant to Chevron's case, but apparently credited Chevron's arguments that the information would 1) "confirm that acts took place in the United States," 2) "'provide evidence about the structure and management' of defendants' alleged fraud scheme," and 3) "establish how the fraud, such as the writing of expert reports and the Ecuadorian judgment, was executed." ER31-32.

Only the first rationale – that Chevron needs to demonstrate that the predicate RICO acts occurred in the United States – might plausibly establish the relevance of the information that Chevron seeks, but the overbreadth is staggering. If Chevron were interested in the location of specific acts of alleged fraud, it easily could have targeted the subpoena to focus on those acts, or the time period surrounding them. The district court did not find evidence that any of the account

holders were participants in fraudulent acts, which is what would be necessary in order to make their locations relevant.

Chevron's remaining arguments fail because neither Chevron nor the court explained how the IP logs would assist in determining the structure and management of the alleged fraud. If what Chevron believes is that knowing the detailed movements of dozens of people over the course of many years will help Chevron map their associations, the argument proves far too much. Neither the district court nor Chevron explained below how IP logs could assist explaining how the alleged fraud was executed; for example, Chevron did not identify evidence that drafts of the Ecuadorian judgment had been emailed among the targeted addresses, or explain a need to know where the users had logged in. These generalized, vague arguments are insufficient to obtain information with the potential to track email users' movements over many years.

The only account for which the district court identified any connection to the relevant topics in the underlying litigation is richard.clapp@gmail.com, and a close look at the evidence demonstrates the irrelevance of the discovery Chevron seeks. The district court found that the owner of this account was an epidemiologist who wrote a 5-page report for a consultant to the Ecuadorian plaintiffs, which allegedly appeared as an appendix to the Cabrera expert report. ER38. Judge Kaplan did find that "[t]he selection and appointment of Cabrera, the preparation and submission of

his report to the Lago Agrio court, and its presentation as his independent work" was one of the key areas of alleged fraud in the case, ER14, which formed the basis for the district court's conclusion that discovery should proceed with respect to this email address. Nonetheless, Chevron has not demonstrated, and the district court did not find, that the 5-page epidemiological report is connected to any fraud in any way that would make the author's *location* relevant, indeed the only information that will be gained from the IP logs. Without showing on the record that would tend to make the location of this account-holder even tangentially relevant, the subpoena must be quashed with respect to richard.clapp@gmail.com.

As noted above, the district court made no findings that the accounts owned by unrepresented users were connected to *any* relevant issues in the underlying litigation. There is even less of a basis to conclude that the IP address information sought – which would show the location of the users – is relevant with respect to these accounts.

Chevron's failure to demonstrate that the subpoenas seek relevant information also requires quashing the subpoenas as to the unrepresented accounts. Unlike the First Amendment issues described below, it is irrelevant to the overbreadth analysis whether the former have standing to challenge the subpoenas with respect to the latter. As the district court noted, it had an "independent obligation" to ensure that Chevron met its burden to "demonstrate the discovery

sought is relevant." ER31. Nonetheless, the court ordered Chevron's subpoenas enforced with respect to the unrepresented accounts,[7] subject only to a narrowing of the end date, without considering whether the information ordered disclosed was discoverable.

In fact, quashing the subpoenas in their entirety is especially important here, where, as described further below at section D, it is likely that a number of the unrepresented users whose information is sought are not present in the United States and do not speak sufficient English to engage in sophisticated American litigation. Many may not have understood the notices that Google and Yahoo emailed (which were presumably in English), much less been able to muster the wherewithal to secure counsel in Northern California to represent them here.

Indeed, the limited utility of this information to Chevron exacerbates the concern that the real purpose of these subpoenas is to harass and intimidate the activists, interns, young lawyers, volunteers and journalists, both in the United

---

[7]        srd.asst@gmail.com, gringograndote@gmail.com, pafabibi@gmail.com, ingrcabrerav@gmail.com, rcabrerav@gmail.com, casotexaco@gmail.com, graham rocks@gmail.com, anemachetes@gmail.com, garcesme@gmail.com, echeverra.ale jandra@gmail.com, invictusdocs2010@gmail.com, comandocondor88@gmail.co m, cara.parks@gmail.com, osimonc@gmail.com, sdonziger@yahoo.com, sdonzige r2@yahoo.com, ingrcabrerav@yahoo.com, rcabrerav@yahoo.com, lcoca62@yaho o.com.mx, jdtorres@yahoo.com, elpezkadr@yahoo.com, pedrofreire69@yahoo.es, fpenafiel1100@yahoo.com, champcw1@yahoo.com, robinsoncofan@yahoo.es, ju anaulestia@yahoo.com.mx, emu_25@yahoo.com, doug_vilsack@yahoo.com, vale ramia@yahoo.com, frente_de_defensa@yahoo.com, ruben.miranda@rocketmail.c om, limcas2002@yahoo.com, and sandragrimaldi12@yahoo.com.

States and around the world, who have shown some sympathy for or supported the Ecuador campaign. Regardless, this Court should not permit Chevron's demand for unnecessary information about these individuals' day-to-day activities without a serious and well-documented showing – wholly absent here – that the information it seeks is relevant to the conspiracy it alleges. The subpoenas should be quashed as to all non-parties.

### 2. If the Subpoenas Are Not Quashed, they Should Be Further Limited to Exclude Irrelevant Information.

Even if some discovery was allowable, the discovery ordered was overbroad. First, the court conceded that it "suspects that the beginning date could [] be more closely tailored to defendants' alleged actions, for example, starting with the filing of a particular environmental report or the launch of a public relations campaign." ER32-33. Nonetheless, it erroneously declined to so limit the subpoenas "because neither party has presented the Court with the facts necessary to [do] so." *Id.* But the burden to show that discovery was properly limited to relevant information is Chevron's, not the targets'. *See, e.g., Green v. Baca*, 226 F.R.D. 624, 654 (C.D. Cal. 2005) ("The party issuing the subpoena must demonstrate . . . that the information sought is relevant and material to the allegations and claims at issue in the proceedings.") (internal quotation omitted). The fact that Chevron failed to justify the subpoenas' breadth is reason alone to

quash them, or at least require more information. It is not a reason to allow Chevron *more* discovery.

Second, the court below "note[d] that Chevron has offered to curtail the subpoenas for any account owner who will attest to the timeframe of his involvement, or lack thereof, with the defendants or the Ecuador litigation." ER33. But it was the court's obligation to narrow the subpoenas in this way, Chevron's promised curtailment notwithstanding. The court instead ordered, for instance, production of over five years of IP logs for cortelyou@gmail.com even though Chevron's own evidence showed that the owner's involvement was limited to a period of months. ER115; ER34.

Third, as noted above, Chevron seeks, and the Magistrate Judge ordered, disclosure of information related to every login, including those with no conceivable bearing on this case. This overbreadth justifies quashing the entire subpoenas, but if the Court disagrees, it should order the lower court to limit any disclosure to the IP information associated with specific communications or, at a minimum, to communications with specific, relevant individuals.

### B. The Subpoenas Violate the Appellants' First Amendment Rights.

The subpoenas should also be quashed in their entirety because they violate the Appellants' First Amendment rights to anonymous speech and association. In order to overcome these constitutional interests, Chevron must meet a high burden:

the First Amendment requires that those who seek to discover the identities of their critics and others who wish to speak and associate anonymously demonstrate a compelling need for such identity-related information before obtaining that discovery.

The Court should treat these subpoenas with particular skepticism, because compliance will chill political speech about damage to the environment and harm to people caused by oil exploration and related activities—speech that receives the highest level of First Amendment protection. *See Meyer v. Grant*, 486 U.S. 414, 422, 425 (1988) (describing the First Amendment protection of "core political speech" to be "at its zenith").

### 1. The Subpoenas Violate Appellants' First Amendment Right to Anonymous Speech.

#### a. The Right to Engage in Anonymous Speech Is Protected by the First Amendment.

The Supreme Court has consistently upheld the right to anonymous speech in a variety of contexts, noting that "[a]nonymity is a shield from the tyranny of the majority . . . [that] exemplifies the purpose [of the First Amendment] to protect unpopular individuals from retaliation . . . at the hand of an intolerant society." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995). Because the First Amendment protects anonymous speech and association, efforts to use the power of the courts to pierce anonymity are subject to a qualified privilege. Courts must

27

"be vigilant . . . [and] guard against undue hindrances to . . . the exchange of ideas." *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 192 (1999). Internet users also enjoy a specific First Amendment interest in their Internet subscriber information. *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011); *see also Doe v. SEC*, No. 11-mc-80184 CRB (NJV), 2011 U.S. Dist. LEXIS 132983, at *8 (N.D. Cal. Nov. 17, 2011) (finding a "protectable speech interest in ISP subscriber information").

The seminal case setting forth the protections an anonymous non-party enjoys under the First Amendment to prevent a litigant from compelling an online service provider to reveal his or her identity is *Doe v. 2theMart.com, Inc.*, 140 F. Supp. 2d 1088 (W.D. Wash. 2001). In that case, which has been cited with approval by courts around the country, the Western District of Washington adopted a four-part test. As this Court has held, *2theMart.com* "sets forth the standard for unmasking a witness." *Mount Hope Church v. Bash Back!*, 705 F.3d 418, 423 n.4 (9th Cir. 2012).[8] In order for the litigant to obtain the anonymous non-party's identity, he must show:

> (1)    the subpoena seeking the information was issued in good faith and not for any improper purpose,

---

[8] *See also, e.g., USA Techs., Inc. v. Doe*, 713 F. Supp. 2d 901, 906 (N.D. Cal. 2010); *Enterline v. Pocono Medical Ctr.*, 751 F. Supp. 2d 782, 787 (M.D. Pa. 2008) (a civil subpoena seeking anonymous commenters' identities from a third-party website violated the speakers' First Amendment rights); *Mobilisa, Inc. v. Doe*, 170 P.3d 712, 719 (Ariz. App. 2007).

28

(2)    the information sought relates to a core claim or defense,

(3)    the identifying information is directly and materially relevant to that claim or defense, and

(4)    information sufficient to establish or to disprove that claim or defense is unavailable from any other source.

*2theMart.com*, 140 F. Supp. 2d at 1095 (line breaks added). That court further stated "non-party disclosure is only appropriate in the exceptional case where the compelling need for the discovery sought outweighs the First Amendment rights of the anonymous speaker." *Id*.

>    **b.    The Right to Anonymous Expression and Association Is Not Limited to Instances in Which a Litigant Seeks the Content of Communications or to Link a Speaker to a Speaker's Statement.**

The district court made two errors, either of which is the basis for reversal, in concluding that the *2theMart.com* test did not apply.

The district court erroneously suggested that the First Amendment is not triggered unless a party "seek[s] the content of emails or a link between the Doe movants' identities and particular statements made by them." ER25. The lower court then asserted that the *2theMart.com* and *Mt. Hope* cases were inapplicable because both sought to connect specific messages with identified individuals. *Id*.

This assertion is incorrect in two ways. First, the First Amendment right to anonymity extends beyond instances in which heretofore private content is sought, as many cases have held where "merely" the identity of online speakers (as here)

are sought. *See, e.g.*, *In re Anonymous Online Speakers*, 661 F.3d at 1173; *2theMart.com*, 140 F. Supp. 2d at 1093; *Dendrite Int'l v. Doe No. 3*, 342 N.J. Super. 134 (N.J. App. Div. 2001); *Doe v. Cahill*, 884 A.2d 451 (Del. 2005); *USA Technologies*, 713 F. Supp. 2d at 901. Similarly, that right need not be triggered by an attempt to tie an anonymous individual to a specific expressive or associational act. Individuals engaged in general discussions of sensitive topics, in controversial forums, or with unpopular people certainly have a legitimate and cognizable First Amendment interest in participating in those discussions without being publicly identified, even if they are not linked to particular messages. *See, e.g., McIntyre*, 514 U.S. at 357 (finding that anonymity protects unpopular individuals from retaliation). In *ACLU v. Reno*, 929 F. Supp. 824, 849 (E.D. Pa. 1996) *aff'd*, 521 U.S. 844 (1997), for instance, the court held that anonymity rightly protects readers as well as speakers, noting: "Anonymity is important to Internet users who seek to access sensitive information . . . ." Here, of course, the reason Chevron is seeking these non-party' identities is their association with its political and legal opponents.

As one oft-cited court noted, "[t]he decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible." *Dendrite*, 342 N.J. Super. at 148. Participating in expressive or associational activities that individuals wish to remain anonymous is sufficient to trigger the

First Amendment, even if an individual is "only" concerned about being identified as a speaker in a particular context and not necessarily about the content of a particular statement.

Second, the district court's assertion about Chevron's motives is factually incorrect. Although Chevron cannot show that any information it demands is relevant to the underlying litigation, it does seek to connect these users' identities to statements that it asserts are part of the alleged civil conspiracy. Chevron admits that the basis of its request is to "confirm who used these email accounts and when to corroborate their use as a part of a fraudulent RICO enterprise and to confirm the locations from which that enterprise operated." ER6.

Chevron's motive is legally indistinguishable from the intended use of the identity information of the non-party in *2theMart.com* which were requested in discovery to demonstrate that they were insiders acting as part of a "pump and dump" scheme, or in *Mount Hope*, where the identities were sought to tie the individuals to the alleged trespass and other claims arising from a physical protest at a church. In each case, the subpoena was intended to link the identities to the allegedly illegal behavior, which was in each case *not* the speech contained in the messages themselves.

31

### c.    The Right to Anonymous Expression Extends to Email and Has Not Been Waived Here.

The lower court also erred by suggesting that, as a category, the identities behind email addresses never deserve anonymity protection. Noting that some email addresses appeared to be the names of some of the Appellants, the court concluded that those parties had not acted in a manner in which anonymity was actually invoked. ER25-26. As an initial matter, email addresses through the services identified in the subpoena—Gmail and Yahoo Mail—may be registered by anyone, even if they include names that appear to indicate ownership by someone other than the actual owner.

Regardless, email addresses that appear to reflect an individual's name are entitled to just as much protection as email addresses that do not. The appearance of absolute secrecy of a speaker's identity has never been a requirement for First Amendment protection. In the *McIntyre* case, for instance, which protected the right of Margaret McIntyre to pass out unsigned leaflets at a community meeting at a middle school in Westerville, Ohio, the fact that many of the attendees of the meeting knew Mrs. McIntyre by sight made no difference to the Court's analysis. The same is true of the Jehovah's Witness members in Wellsville, Ohio, where the Supreme Court held: "The fact that circulators revealed their physical identities did not foreclose our consideration of the circulators' interest in maintaining their

32

anonymity." *Watchtower Bible & Tract Soc. of NY, Inc. v. Village of Stratton*, 536 U.S. 150, 167 (2002).

Even Chevron must concede that the email addresses do not already provide the owner's identity. Chevron claims it served these subpoenas on Google and Yahoo precisely because the email addresses alone did not sufficiently "confirm" the identity of each account holder. If the identity information was not actually needed by Chevron, the district court should have quashed these subpoenas as redundant and unnecessary third-party discovery.

But more importantly, the court erroneously concluded that there could *never* be a First Amendment anonymity interest in the identity of individuals behind *any* email addresses, regardless of whether the address appeared to suggest its owner's name:

> Although the Doe movants may believe that using their email addresses will protect their identities, that belief is simply not reflected by the reality of the world we live in. Email addresses are labels we voluntarily present to the outside world, through which we allow the world to contact us, and in that way identify us.

ER26. Based on this broad assertion, the court declined to apply the heightened First Amendment anonymity test to any of the email addresses sought by Chevron.

This broad conclusion is in conflict with virtually every jurisdiction that has evaluated attempts to unmask online speakers, all of which have applied the First Amendment test to attempt to determine a person's identity from his or her email

address. For instance, in *Mount Hope Church*, the court quashed subpoenas seeking an ISP to identify its users. *Mount Hope*, Case No. C11-536RAJ, Order (granting motion to quash by one anonymous account holder on behalf of six others who had not appeared) (related sanctions order overturned on appeal). *See also, e.g.*, *In re Anonymous Online Speakers*, 661 F.3d at 1173 (seeking identities of website authors via their email addresses); *2theMart.com*, 140 F. Supp. 2d at 1093 (seeking identity of online message board posters via their email addresses); *Dendrite*, 342 N.J. Super. 134 (seeking identities of posters to online message board via their email addresses); *Cahill*, 884 A.2d 451 (seeking identity of an online speaker from his ISP, Comcast); *USA Technologies*, 713 F. Supp. 2d 901 (subpoena to Yahoo for email address of speaker on a message board).[9]

> ### d. As Chevron's Demands for Identity Information Cannot Survive the Scrutiny Required by the First Amendment, They Must Be Quashed.

Contrary to the district court's categorical statements, attempts to unmask anonymous non-party speakers through the use of the discovery process are subject to the heightened protections articulated in the *2theMart.com* First Amendment test. Once applied, the subpoenas plainly fail that test.

---

[9] Even Chevron did not make the same sweeping, overbroad claim that email addresses are not subject to First Amendment protection. It cited, for example *Columbia Ins. Co. v. Seescandy.com*, 185 F.R.D. 573, 578-79 (N.D. Cal. 1999), an early anonymity case in the Northern District of California that, while using a superseded test, implicitly recognizes that email addresses can be subject to First Amendment protection under the right circumstances.

### i. *Chevron Did Not Issue These Subpoenas in Good Faith or for Any Proper Purpose.*

Chevron acknowledges that the email addresses all belong to individuals somehow associated with, or supportive of, its opponents in the Ecuador campaign and that it issued the subpoenas based upon those associations. ER85. Thus, the concern that the subpoenas were issued in order to intimidate Appellants and others who may join with its opponents is clear. Nor is the concern regarding intimidation unreasonable. As discussed in greater detail below, the risk that a critic or political opponent may have his or her identity and all of her emailing locations over *seven years* revealed simply by dint of association with other activists critical of Chevron, even activists who might themselves be legitimately subject to litigation, will have a chilling effect on future political speech. Indeed, many of the non-party named by Chevron in its subpoenas have been intimidated by Chevron's pursuit of their personal information, and the litigation tactics employed by Chevron in this case have already silenced some. *See* ER116; ER113; ER110; ER106; ER103; ER100; ER97.

The serious question about whether Chevron has issued these subpoenas for an improper purpose is exacerbated by the at best marginal relevance of this information, and Chevron's scorched earth tactics in this litigation. Chevron cannot meet the first step of the *2theMart.com* test.

### ii. *Chevron Has Made No Showing that the Information Sought Relates to a Core Claim or that it is Directly and Materially Relevant to that Claim.*

The *2theMart.com* test for non-party requires Chevron to show that the information requested relates to a core claim or defense *and* that the identity information is directly and materially relevant to that claim or defense. *See 2theMart.com*, 140 F. Supp. 2d at 1096. It cannot do so.

As noted above, Chevron argues that it seeks to "confirm" the use of the email addresses as part of a RICO enterprise and the locations of it. ER6. In addition, Chevron repeatedly asserts that it knows in fact who these individuals are. If so, any additional "confirmation" of what Chevron already knows is simply duplicative and therefore not core to its case. Chevron has proceeded to trial in the underlying case without any request to expedite this appeal or stay the underlying case in anticipation of this information, so any claim now that it is related to a core claim, much less directly and materially relevant to that claim, strains credulity.

Moreover, as described above, the subpoenas' breadth is inconsistent with a finding that they relate to a core claim and is directly material to it. The district court ordered disclosure of the identity of the users of 39 accounts, along with IP logs reflecting locations and all other "usage logs" held by Yahoo and Google associated with the accounts, over the course of seven years. It is exceedingly unlikely that all this information, or even a sizeable percentage of it, is in any way

36

relevant to Chevron's claims, much less directly and materially relevant to those claims.

### iii. Chevron Has Made No Showing that the Information Sought Is Unavailable from Any Other Source.

Chevron must also demonstrate that "the information it needs to establish its defense is unavailable from any other source." *See 2theMart.com*, 140 F. Supp. 2d at 1097. It has failed to do this as well.

Chevron already has in its possession a vast amount of email from the parties and direct witnesses. If the question Chevron seeks to answer with these subpoenas is truly whether the owners of the email addresses acted in concert with the parties, for instance by sharing email addresses with them, then the best way to learn the answer would be to ask the parties directly in regular discovery. And Chevron conducted a tremendous amount of discovery in this case including acquiring the entire hard drives of defendants and multiple witnesses, and lengthy depositions. It has made no showing that it asked these specific questions about these specific email addresses before issuing these broad subpoenas.

If Chevron seeks to map the relationship between parties and non-party via the IP logs it requests, and if it means to demonstrate that the defendants are actually in charge of the email addresses rather than the Appellants, then surely the

best evidence of those relationships is the testimony of those very people, testimony that could be obtained in regular party discovery.

In sum, Chevron cannot satisfy the *2theMart.com* test, and its attempt to seek the identities of the Does must be quashed because it violates the Does' First Amendment right to anonymity.

### 2. The Subpoenas Violate the Appellants' First Amendment Right to Association.

The Constitution protects against the compelled disclosure of political associations and beliefs, such as would be disclosed by the identity information and IP logs sought here. Such disclosures "can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Buckley v. Valeo*, 424 U.S. 1, 64 (1976), citing *Gibson v. Florida Legislative Comm*., 372 U.S. 539 (1963); *NAACP v. Button*, 371 U.S. 415 (1963); *Shelton v. Tucker*, 364 U.S. 479 (1960). "Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *NAACP v. Alabama,* 357 US 449, 462 (1958). "The right to privacy in one's political associations and beliefs will yield only to a subordinating interest of the State [that is] compelling," *id.* at 463 (internal quotation omitted), and then only if there is a "substantial relation between the information sought and [an] overriding and compelling state interest." *Gibson,* 372 U.S. at 546.

38

This exacting scrutiny applies not only to direct restraints on associations, but also to more indirect governmental actions that "would have the practical effect of discouraging the exercise of constitutionally protected political rights." *NAACP v. Alabama*, 357 U.S. at 461 (internal quotation omitted). Courts have recognized that this practical effect of discouraging political speech can occur from surveillance of political activities. *Zweibon v. Mitchell*, 516 F.2d 594, 634 (D.C. Cir. 1975). It can also occur from the issuance of civil discovery. *NAACP v. Alabama*, 357 U.S. at 460-63 (an attempt by the state to compel disclosure of the membership rolls of a political advocacy group had constitutionally impermissible chilling effects); *Perry*, 591 F.3d at 1139 ("The compelled disclosure of political associations can have just such a chilling effect.").

This Court has held that a qualified First Amendment privilege in associational information sought by a subpoena exists once a party makes a prima facie showing that compliance "will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights." *Brock v. Local 375, Plumbers International Union of America, AFL-CIO*, 860 F.2d 346, 350 (9th Cir. 1988); *Dole v. Service Employees Union, AFL-CIO, Local 280*, 950 F.2d 1456, 1460-61 (9th Cir. 1991); *Perry*, 591 F.3d at 1140.

39

The Appellants' burden to make this showing is "light" due to the "crucial place speech and associational rights occupy under our constitution[.]" *N.Y. State National Organization for Women v. Terry*, 886 F.2d 1339, 1355 (2d Cir. 1989). Declarations are sufficient to make this showing. *Perry*, 591 F.3d at 1143.

Once Appellants satisfy this standard, the burden shifts to Chevron to show that the information sought is "rationally related to a compelling government interest . . . [and is] the 'least restrictive means' of obtaining the desired information." *Id.* at 1140 (*quoting Brock*, 860 F.2d at 350).

Here, the district court ordered production not only of the Appellants' identities but also their login IP addresses, information that reveals their locations and movements over a period of up to seven years. As Justice Sotomayor recently observed, continual location monitoring over a prolonged period "reflects a wealth of detail about [a person's] familial, political, professional, religious, and sexual associations." *See United States v. Jones*, 132 S. Ct. 945, 954 (2012) (Sotomayor, J., concurring) The D.C. Circuit confirmed the connection between location tracking and associations, noting that it:

> reveals types of information not revealed by short-term surveillance, such as what a person does repeatedly, what he does not do, and what he does ensemble. . . . A person who knows all of another's travels can deduce whether he is a weekly church goer, a heavy drinker, a regular at the gym, an unfaithful husband, an outpatient receiving medical treatment, **an associate of particular individuals or political groups**—and not just one such fact about a person, but all such facts.

40

*United States v. Maynard*, 615 F.3d 544, 562 (D.C. Cir. 2010), *aff'd sub nom.*
*Jones*, 132 S. Ct. 945 (emphasis added).

In light of this settled legal framework, the district court erred in two key
ways. First, it held that the Appellants could not claim the protection of the First
Amendment because they were not members of a single, formally organized
association. Second, the district court erred by finding that the First Amendment
could not apply because IP logs are not in and of themselves speech. Because of
these errors, the district court failed to apply the Ninth Circuit test.

### a.    Appellants Do Not Need to Be Part of "One Group."

The district court first erred by finding that the Appellants political actions
and associations fail to qualify as "protected activity" under the First Amendment
because they are not part of "one group." ER27. In fact, the district court quashed a
similar subpoena seeking information about a specific group, Amazon Watch,
noting that "[A]ll that Chevron has shown this Court is that Amazon Watch has
been very critical of Chevron's operations in Ecuador." *Chevron v. Donziger*, No.
13–mc–80038, 2013 WL 1402727, *4 (N.D. Cal. Apr. 5, 2013).

The same is true here. Chevron admittedly seeks this information based
upon Appellants' association with the Ecuador campaign and seeks to use it to
track those associations over a nine-year period. There is no question that
participation in political campaigns is a protected activity. *See San Francisco*

41

*County Democratic Cent. Comm. v. Eu*, 826 F.2d 814, 827 (9th Cir. 1987) ("The right of individuals to associate for the advancement of political beliefs is fundamental . . . .") (internal quotation omitted).

That the doctrine protects not just members of a single, formally organized group, but instead reaches all involved in a campaign to the extent that information is sought based upon their participation in the campaign is demonstrated in the most recent Ninth Circuit analysis, *Perry v. Schwarzenegger*, 591 F.3d 1126 (9th Cir. 2009). *Perry* arose from California's Proposition 8, which sought to require that marriage in California be solely between a man and a woman. The court considered a request for production of documents seeking: "All versions of any documents that constitute communications referring to Proposition 8, between you and any third party, including, without limitation, members of the public or the media." *Perry,* 591 F.3d at 1132. The motion to quash on associational grounds was supported by declarations from two organizations, ProtectMarriage.com and the Yes on 8 campaign, and discussed the threat to "agents, contractors, attorneys, donors or others." *Perry v. Schwarzenegger*, 264 F.R.D. 576, 578 (N.D. Cal. 2009). Thus, the subpoena encompassed information about people who were members of multiple groups and included attorneys, contractors and donors more generally supportive of the broader cause. Yet the fact that the request reached beyond members of a single group played no role in the court's consideration of

42

whether the "practical effect" of the subpoena would be to chill associational rights.

Similarly here, the information sought is about attorneys, activists, journalists, volunteers and interns who have supported the Ecuador campaign. The fact that they are not members of a single formal organization does not change the First Amendment analysis- they are associating for the same cause. And Chevron seeks information about their associations precisely because of that cause; *i.e.*, it seeks discovery on the basis of their political and expressive associations.

The district court also relied on the fact that the subpoenas even reach those who were not directly affiliated with the litigation. But that only shows that the subpoenas are overbroad. It certainly does not cure the First Amendment problem. To the extent that Chevron reached even beyond the Ecuador campaign in its subpoenas, this was due to Chevron's overreaching, rather than anything done by the Appellants and should certainly not be a basis for denying them constitutional protection. The plain purpose of the subpoenas was to identify and track the locations of individuals involved with the Ecuador campaign over a span of nine years.

As noted above, the relevant question is not whether the individuals targeted by Chevron are members of a single group, but whether the disclosure "would have the practical effect of discouraging the exercise of constitutionally protected

43

political rights." *Dole*, 950 F.2d at 1460 (*quoting NAACP v. Alabama*, 357 U.S. at 461 and *Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 393 (1950)) (internal quotation marks omitted). As demonstrated in their declarations and described further below, Appellants easily meet that test.

The district court mistakenly relied on *Anderson v. Hale*, Case No. 00-C-2021, 2001 WL 503045 (N.D. Ill., May 10, 2001), an unreported case from the Northern District of Illinois, in which the World Church of the Creator was a defendant. In that case, the Magistrate Judge denied a motion to quash a subpoena seeking information about thirteen email accounts that were used by the defendant church as "contact people for specific inquiries" about the church.

That case is not binding on this Court and is also easily distinguishable. It involved inquiries about only a few email addresses, each of which served directly as contact points for a party to the case. The associational question was whether the fact that the subscriber information and address books of those email addresses might incidentally reveal the identities of otherwise anonymous church members was a sufficient basis to quash the subpoena. The court held that it was not, noting that the possible revelation of identities of previously unidentified members of the church in the address books of the contact people for the church was "indirect and incidental." *Hale* at *6.

Here, the Appellants are undisputedly non-parties, yet the subpoenas seek information about their identities and associations based upon their involvement in the Ecuador campaign. Unlike in *Hale*, disclosure of non-parties' identities is not "incidental;" the non-party Appellants' associations are precisely the target of Chevron's subpoenas.

### b. Appellants' IP Login Information Reveals Associations.

The district court also erred in its consideration of whether the right of association is triggered by the forced revelation of location information for a seven-year period. Instead of addressing the Ninth Circuit test, which requires considering whether the "practical effect" of disclosing the information would result in a chilling effect on speech, the district court simply concluded "IP Logs are not speech." ER23.

Yet the test turns not on what kind of information is sought, but instead on whether revelation of that information could result in a chilling effect. As noted in the discussion of *Jones* above, the fact that location information can reveal associations is undisputed and Chevron seeks this information specifically to track Appellants' associations over seven years.[10] Thus, the "practical effect" test should have been applied and, as described below, has been met by Appellants.

---

[10] In *Jones* the monitoring was merely four weeks; here Chevron seeks nine years, albeit not with the sort of moment-by-moment specificity of GPS monitoring.

### c. Appellants Have Established a Prima Facie Case that their Expression Has Been Chilled.

Because the district court mistakenly believed that the right of association did not apply, it did not conduct the necessary First Amendment analysis. Under it, Appellants had the burden to demonstrated a prima facie case that compliance with the subpoena is likely to create "some form or specter of harassment, threat, or reprisal" for the Appellants, chilling their freedom to associate. *Buckley v. Valeo*, 424 U.S. at 74. They have done so.

The Does have confirmed that they feel harassed by Chevron's subpoenas and fear future harassment if Chevron actually gains the information. ER116; ER113; ER110; ER106; ER100; ER97. Two declarants expressed concern for their physical safety if Chevron gained access to the information it sought. ER106; ER103.

Some Does have stated that other individuals have been subjected to harassment, threats, and intimidation for working in connection with the litigation against Chevron in Ecuador or related activism efforts. ER106; ER103. Two Doe declarants noted that they have refused opportunities to work on the Chevron litigation after seeing what Chevron had put other activists through. ER116; ER99-100.

Many of the Does stated that if they had known that their email usage information and location would be revealed to Chevron, they might have altered

their expression during the time they participated in the Ecuador campaign. ER116; ER113; ER110; ER97. They have also said that their future political and associational activities related to Chevron will be chilled if the company obtains the personal information it seeks. ER116; ER113; ER110; ER106; ER99-100; ER97. They believe their associational activities will likely be chilled more generally, as well. ER116; ER113; ER110; ER106; ER100; ER97.

Thus, the Appellants have made a prima facie showing that the service providers' compliance with Chevron's subpoenas will chill their constitutionally protected associational rights. This is hardly surprising; few would be willing to engage in political activism if they knew their political opponents could track their movements over the preceding decade and thus potentially glean the most personal of details about their lives.

> **d.    Disclosure of the Appellants' Information Does Not Serve a Compelling Interest and Is Not the Least Restrictive Means of Furthering a Compelling Interest.**

Since Appellants have made a prima facie case of a chilling effect, the burden shifts to Chevron to demonstrate that that the information it seeks is "rationally related to a compelling government interest . . . and the least restrictive means of obtaining the desired information." *Perry*, 591 F.3d at 1140 (internal quotation marks omitted).

47

Chevron sought nine years of information about each of the 70 email accounts listed in the subpoenas, but has made no effort to show how each account holder's information is relevant to Chevron's RICO claims. As noted above, they are not. *See infra* at A.1.

Furthermore, there is every indication that the subpoenas were not tailored at all, much less carefully tailored, to avoid infringing the Appellants' associational freedoms. Indeed, the discovery demands indiscriminately seek information about each and every one of the email accounts since 2003, without any tailoring or limitation whatsoever on the face of the subpoenas.[11] Moreover, this broad scope, even as narrowed by the district court, supports Appellants' concern that the subpoenas were meant to harass and intimidate those involved in the Ecuador campaign, rather than to seek needed information for the litigation. As also noted above, these subpoenas are not the least restrictive means of obtaining the desired information. Chevron concedes it has "already obtained thousands of emails sent to and from the RICO defendants and those associated with them," ER29-30, as well as other extraordinary discovery, *supra* at A.1.

In *Shelton v. Tucker*, the Supreme Court considered a similarly indiscriminate collection of associational information through a requirement that

---

[11] The carelessness of these subpoenas is underscored by the fact that Google did not even launch Gmail until April 2004. History of Gmail, https://en.wikipedia.org/wiki/History_of_Gmail (last visited Nov. 17, 2013).

teachers to provide all of their associational ties for a five year period, even though many of those ties, like the location information collected here, had nearly no reasonable relationship to the government's legitimate interest in teacher fitness. The Supreme Court rejected that effort, noting that this requirement would gather in "every conceivable kind of associational tie—social, professional, political, avocational, or religious," and noted that many such relationships could have no possible bearing upon the teacher's occupational competence or fitness. *Id. at* 487-88.

So too here. Chevron's subpoenas are squarely aimed at not only identifying, but also mapping the movements of individuals it believes are involved in political expression: specifically, the Ecuador campaign.[12] Among other things, the IP address information Chevron seeks could tell the company when the non-party Appellants were in the United States or Ecuador; when they were in a particular town, building, home, or even a particular organization's office; and when each non-party was in the same place at the same time as other individuals whose email usage information is revealed, presumably meeting with each other. *See* ER125. While the aim is tracking political opponents, the lack of narrow tailoring is clear.

---

[12] All of which is highly protected speech. *See, e.g.*, *NAACP v. Button*, 371 U.S. at 429-31 (litigation is a form of political speech); *Thomas v. Collins*, 323 U.S. 516, 537 (1945) (First Amendment protects advocacy to "persuade to action").

If Chevron is claiming that all account holders were involved in the alleged "ghostwriting," that claim is ridiculous on its face. If not, then it was Chevron's burden below to specify which target participated in which particular aspect of the alleged fraud, present specific evidence backing up each claim, and demonstrate how the discovery sought is necessary to prove its case *against the defendants*. Without such a showing, Chevron is simply slinging mud at non-parties.

Thus, Chevron cannot meet the standards of strict scrutiny with its subpoenas here and the district court erred in failing to quash it in its entirety.

> i.    **Appellants' Right to Anonymous Speech is Not Waived by the fact that the Providers Have their Names.**

The district court incorrectly relied on the statement in the ISP's privacy policies that the ISPs would provide IP logs in response to a valid subpoena to find that the Appellants have waived any expectation of privacy. Not so.

The privacy policies merely state that the companies will comply with lawful process.[13] Far from being a waiver, the terms of service simply beg the question of *whether* these subpoenas are valid – something to be decided according to the large body of case law concerning standards for the protection of

---

[13] "We will share personal information with companies . . . outside of Google if we have a good-faith belief that access . . . is reasonably necessary to: meet any applicable law, regulation, legal process." Google Privacy Policy, ER65. "We respond to subpoenas, court orders, or legal process, or to establish or exercise our legal rights or defend against legal claims." Yahoo Privacy Policy, ER56.

information in the possession of ISPs from civil subpoenas. *See, e.g., In re Anonymous Online Speakers*, 661 F.3d at 1173 (the right to speak anonymously online "promotes the robust exchange of ideas and allows individuals to express themselves freely"); *see also Doe v. SEC*, 2011 U.S. Dist. LEXIS 132983, at *8 (finding a "protectable speech interest in ISP subscriber information").

Moreover, the Magistrate Judge made a factual error in holding that "IP logs associated with their email accounts are the addresses visible to the outside world associated with their accounts." ER31. This is both irrelevant and untrue. It is irrelevant because even if location information were visible to some people at some times, this is no different from GPS tracking – which clearly implicates associational rights, even though most of what it shows is movements that would be visible to the public. Nonetheless, these IP addresses are *not* publicly visible; if an individual uses the "webmail" version of Gmail or Yahoo mail, then the recipient will not see the user's IP address, but only the address of the webmail server. The user's own IP address will be visible only to Google or Yahoo. Further, the IP logs of Google and Yahoo are not publicly visible. A single IP address may be visible to a single recipient of a message, but the flow of IP addresses over seven years collected by an ISP is simply not available from any public place. Indeed, if IP logs were in fact public, Chevron would have no need for these subpoenas.

51

### C.    The Subpoenas Unnecessarily Violate the Appellants' Privacy Interests Under the California Constitution.

For many of the reasons why Chevron's subpoenas fail under the United States Constitution, they independently violate the Appellants' right to privacy under the California Constitution, Article 1, section 1. "The right of privacy is an 'inalienable right' secured by article I, section 1 of the California Constitution. It protects against the unwarranted, compelled disclosure of various private or sensitive information regarding one's personal life, including his or her . . . political affiliations . . . and confidential personnel information." *Tien v. Superior Court*, 139 Cal. App. 4th 528, 539 (2006). The right of privacy in California "protects individuals from the invasion of their privacy not only by state actors but also by private parties." *Leonel v. American Airlines, Inc.*, 400 F.3d 702, 711 (9th Cir. 2005).

While the district court recognized that there is no California law on point, it erred by analogizing Chevron's requests to requests for a unique device identifier (such as a cell phone's serial number) or for mere email subscriber information. ER29. But as with the GPS tracking over time at issue in *Jones*, Chevron's subpoenas are vastly more intrusive than a one-off request for a URL or unique device identifier. *See*, *e.g.*, *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1025 (N.D. Cal. 2012); *In re iPhone Application Litig.*, 844 F.Supp.2d 1040, 1063 (N.D. Cal. 2012). No California court has addressed a request that would allow a civil

litigant to track the locations and associations of dozens of users over the course of a decade. As a matter of first impression, this Court should find that Chevron's requests violate the California Constitution.[14]

In order for information to be protected from discovery under the California right to privacy, the Appellants must demonstrate three elements: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy under the circumstances; and (3) a showing that production would lead to a serious invasion of the protected privacy interest. *Leonel*, 400 F.3d at 712, citing *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal.4th 1, 39-40 (1994). Appellants' privacy interests, on the one hand, must then be balanced against "right of a civil litigant to discover relevant facts," on the other. *Tien*, 139 Cal. App. 4th at 539, *quoting Hooser v. Superior Court*, 84 Cal. App. 4th 997, 1004 (Cal. Ct. App. 2000).

Appellants have a legally protected privacy interest in their identities and locations, particularly the location of their homes. *See, e.g., Planned Parenthood Golden Gate v. Superior Court*, 83 Cal. App. 4th 347, 360 (2000) ("Human experience compels us to conclude that disclosure [of identity and location] carries with it serious risks which include, but are not limited to: . . . the offensive and obtrusive invasion of the individual's neighborhood for the purpose of coercing the individual to stop constitutionally-protected associational activities and the

---

[14] But if the Court has any doubts on that score, it should certify the question to the California Supreme Court, pursuant to Rule 8.548 of the California Rules of Court.

infliction of threats, force and violence."). The Appellants' privacy interests in their identities and locations are particularly potent in the context of a global activism campaign that has included harassment and threats to personal safety of those who have criticized Chevron.

The Appellants have a reasonable expectation of privacy in their identity and location information. The mere fact that some of the Appellants participated in litigation against Chevron or associated advocacy gave them little reason to expect that their identities and information that could track their location over nearly a decade would be handed to Chevron. And finally, for all of the reasons discussed above, including harm to the Appellants' free speech and associational interests, the chilling effects of disclosure, the likelihood of harassment, and the threat to some of the Does' physical safety, disclosure of the information Chevron seeks would lead to a "serious invasion" of the Appellants' privacy interests. *See Hill*, 7 Cal.4th at 37.

Balanced against Chevron's stated need for the information—to discover whether these email accounts were used by "key figures" in the litigation, or the locations of allegedly fraudulent acts—the Appellants' privacy interests prevail. There are other, better, methods to discover the information Chevron seeks, such as in regular party discovery. Chevron cannot show that its need for these subpoenas outweighs the privacy interests of those non-parties. If Chevron is unable to make

such a showing, the California Constitution mandates that these subpoenas be quashed. *See Planned Parenthood Golden Gate*, 83 Cal. App. 4th at 369.

### D. The Appellants Have Third-Party Standing to Quash the Subpoenas in their Entirety.

There is no dispute that Appellants have standing to challenge Chevron's subpoenas with respect to their own accounts. But the district court improperly declined to permit the Appellants to challenge the subpoenas as to the 33 unrepresented accounts.

Appellants have met their burden to show that Chevron's subpoenas burden the exercise of their First Amendment rights. Because First Amendment cases present "unique standing considerations [they] tilt dramatically toward a finding of standing." *Lopez v. Candaele*, 630 F.3d 775, 781 (9th Cir. 2011) (internal quotations omitted).

The third-party standing doctrine is not limited to facial challenges to overbroad statutes, nor is the lessened third-party standing standard in First Amendment cases so limited. Courts have applied this doctrine to recognize the standing of third parties to move to quash subpoenas seeking the identities of anonymous online speakers who have not directly asserted their own First Amendment rights. *See*, *e.g.*, *Mount Hope*, Case No. C11-536RAJ, Order (granting motion to quash by one anonymous account holder on behalf of six others who had not appeared); *Enterline*, 751 F. Supp. 2d 782 (finding media company had

55

standing to assert First Amendment rights of anonymous commenters on its website); *Ind. Newspapers Inc. v. Junior Achievement of Cent. Ind., Inc.*, 963 N.E.2d 534, 549 (Ind. Ct. App. 2012) (same); *McVicker v. King,* 266 F.R.D. 92, 95-6 (W.D. Pa. 2010) (same). This Court should follow suit to protect the First Amendment freedoms of dozens of individuals who likewise may not be able to assert their own interests.

Even apart from the First Amendment, the Supreme Court has long recognized that prudential standing allows a third party to assert another's rights where the third party (1) has personally suffered injury in fact, (2) has a "close" relationship to those whose rights he seeks to assert, and (3) "there is a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (citing *Powers v. Ohio*, 499 U.S. 400, 411 (1991)); *see also Sec'y of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984) (third-party standing should be extended "[w]here practical obstacles prevent a party from asserting rights on behalf of itself). Such standing is especially appropriate where the third party "can reasonably be expected properly to frame the issues and present them with the necessary adversarial zeal." *Id*. (citing *Craig v. Boren*, 429 U.S. 190, 193-194 (1976)).

56

Appellants easily meet either third-party standing test. First, Appellants have unquestionably suffered injury in fact and possess standing to challenge Chevron's subpoenas on their own behalf.

Second, contrary to the district court's assertion, Appellants have unquestionably asserted a "close" relationship to the unrepresented users whose information Chevron seeks. As noted above, in order to show that information regarding the non-movants is relevant and therefore even potentially discoverable, Chevron had to show at the outset that each non-movant had something to do with the Ecuadorian litigation. Because Chevron failed to do so, the subpoenas must be quashed on that basis alone. But if Chevron had made that showing, its allegation that the users have a close relationship to the Ecuador campaign—and the people working on the campaign—is *precisely* the reason Chevron has targeted the account holders, Appellants and unrepresented alike. ER77. Chevron cannot now argue that Appellants do not have a close relationship to the unrepresented account holders, since that would only confirm, as Appellants have shown, that Chevron has not met its burden to demonstrate that the movants and non-movants have a significant relationship with the Ecuador litigation and thus that Chevron's subpoenas are overbroad.

In *Kowalski*, the Supreme Court held that the plaintiffs in that case lacked a close relationship to a *hypothetical* class of individuals they sought third-party

57

standing to represent. *Kowalski*, 543 U.S. at 130. In that case, the named plaintiffs were criminal defense attorneys challenging the application of a Michigan law to their future indigent clients. The Court held that a future relationship with a group of as yet unascertained third-parties, as opposed to an existing relationship, was insufficient to confer third-party standing. *Id*. Here, Appellants are asserting the rights of very much non-hypothetical users with whom they are similarly situated.

Third, the holders of the email accounts who did not appear before the district court plainly faced practical obstacles to asserting their rights. Chevron has consistently misstated that account holders who have not reached out to negotiate with Chevron directly or moved to challenge the subpoenas in court have "chosen not to object to Chevron's requests." ER81. But there is no indication that each affected account owner has received actual notice of Chevron's subpoenas, much less made a "choice" not to object. While the ISPs' voluntary efforts to notify their customers about the subpoenas are commendable, they are a far cry from effective legal service of process. Some of the account owners may have missed the messages sent by the service providers, or may have been slow to read them— indeed, one account holder joined the Appellants' motion to quash only just prior to the filing of Appellants' reply brief in the district court. ER52.

Some of the email addresses may also no longer be functional, raising serious doubts that their former owners ever learned of Chevron's subpoenas.

58

Given the international nature of the underlying dispute, some of the email account holders likely live and work internationally, which may make it difficult for them to obtain counsel to challenge these subpoenas in federal court in California. Some may not read English and therefore not have understood the notice, and still others may simply have missed the email informing them that Chevron was seeking their information.

The district court erroneously held that, although there could "possibly [be] hurdles" to moving to quash Chevron's subpoenas, because Appellants had managed to "overcome" those hurdles and managed to find representation on short notice, the unrepresented account holders could not have been similarly not restrained by those same hurdles. ER21-22. But the test is merely whether there was a "hindrance;" Appellants need not show that appearance was impossible. The fact that Appellants were able to appear does not suggest that others were not hindered in doing so. Prudential third-party standing exists precisely to protect the rights of non-parties who were unlucky enough to stumble over the kinds of hurdles facing the non-movants here. Appellants should be permitted to stand for those targets.

For all these reasons, a number of the email account holders face practical obstacles to asserting their own interests in this action.

59

Finally, the Appellants can frame the issues properly and have unquestionably presented them with adversarial zeal. The Appellants and the owners of the other email accounts listed in the subpoenas are similarly situated. Chevron seeks the same information about each of these individuals, and each account owner has First Amendment interests in the information sought by Chevron. The Appellants have presented the legal issues in a manner that applies to all the affected individuals, and have retained counsel with significant expertise in issues relating to the intersection of technology, advocacy, and law to litigate these questions vigorously.

For these reasons, the Court should find the Appellants have standing to challenge the subpoenas as they apply to each individual named in them not otherwise represented by counsel.

## VIII. CONCLUSION

For the reasons stated above, Appellants respectfully request that this Court reverse the lower court's order to the extent it required Google and Yahoo to divulge information pursuant to Chevron's subpoena and remand with instructions

60

to grant the Appellants' motion to quash Chevron's subpoenas in their entirety as to all Appellants and the 33 unrepresented accounts.

Dated:  November 22, 2013                    Respectfully submitted,

                                             By:   /s/ Cindy Cohn
                                                 Cindy Cohn
                                                 Nathan Cardozo
                                                 ELECTRONIC FRONTIER FOUNDATION
                                                 815 Eddy Street
                                                 San Francisco, CA 94109
                                                 Telephone:  (415) 436-9333

                                                 Marco Simons
                                                 EARTHRIGHTS INTERNATIONAL
                                                 1612 K Street, N.W., Suite 401
                                                 Washington, DC 20006
                                                 Telephone:  (202) 466-5188

                                                 *Counsel for Non-Party*
                                                 *Movants-Appellants*

61

13-16920

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

CHEVRON CORPORATION,

PLAINTIFF-APPELLEE,

V.

STEVEN DONZIGER; THE LAW
OFFICES OF STEVEN R. DONZIGER;
DONZIGER & ASSOCIATES, PLLC;
JAVIER PIAGUAJE PAYAGUAJED;
HUGO GERARDO CAMACHO,

DEFENDANTS,

V.

JOHN DOE; JOHN RODGERS; LAURA
BELANGER,

NON-PARTY MOVANTS-APPELLANTS.

**STATEMENT OF RELATED CASES**

To the best of our knowledge, there are no related cases.

Dated: November 22, 2013          Respectfully submitted,

By:   /s/ Cindy Cohn
      Cindy Cohn
      Nathan Cardozo
      ELECTRONIC FRONTIER FOUNDATION
      815 Eddy Street
      San Francisco, CA 94109
      Telephone: (415) 436-9333

Marco Simons
EARTHRIGHTS INTERNATIONAL
1612 K Street, N.W., Suite 401
Washington, DC 20006
Telephone:  (202) 466-5188

*Counsel for Non-Party
Movants-Appellants*

**CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMITATION,
TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS
PURSUANT TO FED. R. APP. P. 32(a)(7)(C)**

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify as follows:

1.      Appellees' Opening Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,164 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2011 for Mac, the word processing system used to prepare the brief, in 14 point font in Times New Roman font.

Dated:  November 22, 2013          By:   /s/ Cindy Cohn
                                                  Cindy Cohn

                                             *Counsel for Non-Party
                                             Movants-Appellants*

64

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 22, 2013.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  November 22, 2013          By:  /s/ Cindy Cohn
                                             Cindy Cohn

                                             *Counsel for Non-Party*
                                             *Movants-Appellants*